# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01657-SCT

*COMMUNITY BANK, ELLISVILLE, MISSISSIPPI*
*f/k/a MERCHANTS AND MANUFACTURERS BANK*

*v.*

*ARCHIE WAYNE COURTNEY*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/23/2001 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DONNA BROWN JACOBS |
| | JOHN C. HENEGAN |
| | J. STEVENSON RAY |
| | MARY JACQUELINE WATSON EASLEY |
| | AMY D. WHITTEN |
| ATTORNEYS FOR APPELLEE: | THOMAS J. LOWE, JR. |
| | LAWRENCE E. ABERNATHY, III |
| | JOHN T. KERSH |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 06/10/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This case involves the alleged conversion of certain pieces of equipment by Community Bank of Ellisville formerly known as Merchants & Manufacturers Bank ("the Bank"). Archie Wayne Courtney (Courtney) had some loans with the Bank for equipment used in his plumbing business. In 1991, Courtney defaulted on a consolidated loan payment and the Bank eventually sought an order of possession from the

trial court to retrieve and sell the collateral. Courtney alleged that the Bank and Holifield and Sons Wrecker Services erroneously picked up some equipment and converted this collateral.

¶2. In *Courtney v. Merchs. & Mfrs. Bank*, 680 So.2d 866, 866 (Miss. 1996) (*Courtney I*), this Court held that the Bank did not have "a valid security interest in the backhoe, even though the parties may have originally intended for the backhoe to serve as security." On remand from this Court's ruling in *Courtney I,* the case was tried in the Circuit Court of Jones County. The jury awarded Courtney $345,000 in actual damages and $5,000,000 in punitive damages.

¶3. The Bank filed a motion for new trial and a j.n.o.v. and in the alternative for a remittitur. The trial court granted the Bank a setoff or recoupment of $38,803.12, which was the amount of the deficiency in this matter. However, the court refused to grant a remittitur on actual damages. Moreover, concluding that the award of punitive damages was excessive, the court remitted that award to $1,500,000. Courtney subsequently accepted this remittitur, and the Bank appealed.

**FACTS**

¶4. The Bank regularly provided loans to Archie Courtney, owner of Courtney Plumbing, Inc., in connection with Courtney's plumbing and septic tank business. These loans typically took the form of promissory notes, which were secured by both purchase money and non-purchase money security interests in Courtney's heavy equipment used in his business. Over a period of time, these separate promissory notes would typically be consolidated into one.

¶5. Courtney experienced severe financial problems, and he filed for Chapter 13 Bankruptcy on February 18, 1992. On April 14, 1992, the Bank filed suit against Courtney, alleging that he was in default on two of the promissory notes. The Bank requested that Courtney, who was serving as his own attorney,

be required to pay the balance on the notes and to surrender possession of various collateral which he had pledged as security on the notes.

¶6. At the hearing on the Bank's complaint on May 7, 1992, the primary dispute centered around a 1986 Case 580E Super E backhoe, which was listed as security on the Bank's copy of one of the promissory notes, but not on Courtney's copy thereof. When asked about this discrepancy, Tommy Stroud, vice-president of the Bank, testified that his secretary had originally forgotten to type the backhoe on the note and, realizing her mistake at a later date, had added the backhoe to the instrument. The Bank did not seek Courtney's ratification of the addition of the backhoe, however, nor did it inform him that the note had been altered.

Following a hearing, the trial judge entered an order of possession in favor of the Bank for the equipment listed as security on the promissory note, including the backhoe. Courtney subsequently filed a complaint against the Bank for allegedly seizing property in addition to that which it was entitled to pursuant to the order of possession, to which the Bank responded with a motion for summary judgment. The trial court granted the summary judgment motion, and Courtney timely filed an appeal from said ruling as well as from the order of possession entered in favor of the Bank with regard to the backhoe.

¶7. In *Courtney I*, this Court reversed "the order granting possession of the backhoe to the Bank and render[ed] judgment that the Bank holds no proper security interest in the backhoe." 680 So.2d at 869. As to the summary judgment issue, this Court held that the case should be remanded for a determination of whether the Bank had actually returned the wrongfully seized property. *Id.* The Court concluded that if Courtney represented in writing that the Bank had returned the property, then no further proceedings would be required. *Id.* After this Court's ruling in *Courtney I*, the trial court granted Courtney's motion to restore the case to the active docket for a jury trial. Courtney filed a motion for an amended

counterclaim, which the trial court granted. At trial, Courtney claimed that the bank converted nine pieces of property:

1.  Case 580 Super E Backhoe;
2.  An auto mixer concrete truck ("concrete truck");
3.  A ditcher;
4.  A backhoe;
5.  Mack truck;
6.  FastBack trailer;
7.  Two (2) sets of chains with binder;
8.  Transit; and
9.  Water system and rep. clamps

## DISCUSSION

### I.      Conversion and J.N.O.V.

¶8.      Denials of peremptory instructions, motions for directed verdict, and motions for judgment notwithstanding the verdict each challenge the legal sufficiency of the evidence presented at trial. *Moore v. State*, 859 So.2d 379, 383 (Miss. 2003). They are, therefore, reviewed under the same standard. *Id.* This Court has held:

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgement might have reached different conclusions, affirmance is required.

*Id.*

¶9.      It is elementary that ownership is an essential element of conversion. This Court has held that "[t]o make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of **the owner's right**, or of an unauthorized and injurious use, or of a wrongful

4

detention after demand." ***Smith v. Franklin Custodian Funds, Inc.***, 726 So.2d 144, 149 (Miss. 1998) (emphasis added). "[T]here is no conversion until the title **of the lawful owner** is made known and resisted or the purchaser exercises dominion over the property by use, sale, or otherwise." ***Miss. Motor Fin., Inc. v. Thomas***, 246 Miss. 14, 149 So.2d 20, 20 (1963) (emphasis added).

¶10. Courtney alleges that the Bank converted nine pieces of equipment, but the record indicates that Courtney did not own all these items. The evidence clearly establishes that Courtney owned the chain and binders, as well as the ditcher, concrete truck, and backhoe attachment. Courtney also owned the transit and water system repair clamps.

¶11. Courtney testified that his father owned the fastback trailer. Courtney also indicated that the Mack truck was "strictly" his father's. He stated that his father was the owner of the "big items" at issue in this case. Initially, Courtney testified that the Super E backhoe actually belonged to his father. When asked if his father owned five specific pieces of the equipment,[1] Courtney testified that his father "wasn't the owner of the chain and binders. He would have been on the backhoe and stuff." He later recanted this testimony, stating that he and his father owned the Super E backhoe jointly.

¶12. The Bank moved for directed verdict at the close of Courtney's case-in-chief with respect to the ownership of the ditcher, concrete truck, and backhoe attachment. The court took this motion under advisement. However, it denied the Bank's general motion for directed verdict. The clear evidence that Courtney's father owned some of the property in question was elicited during the Bank's case-in-chief. The trial court denied the Bank's j.n.o.v. on conversion.

---

[1]The Bank's attorney asked Courtney, "you are claiming [your father] is the owner of all these on this list?" The question referred to a list of equipment in the amended counterclaim, namely, the Super E backhoe, chains and binder, the Mack truck, the concrete truck, and the fast back trailer.

¶13. The evidence is overwhelming that Courtney did not own all the property at issue in this case. Based on his own admissions, it is clear that Courtney was not the owner of the Mack truck or the fastback trailer. Because Courtney did not own these items, and ownership is an essential element of conversion, the trial court erred in denying the Bank's j.n.o.v. as to those items.

## II. Conversion and security interests.

¶14. The elements of conversion are established in Mississippi. We have stated:

> It is well settled that the acts alleged to constitute a conversion must be positive and tortious. In *McJunkin v. Hancock*, the Court said: "To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand. In *Spooner v. Holmes*,...the Court said: "Action of tort ... cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself, or to deprive the rightful owner of it, or destroyed the property." In *Lee Tung v. Burkhart*, the Court held that in order to maintain an action for conversion, there must have been, on the part of the defendant, some unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiff's rights, or else a withholding of the possession under a claim of right or title inconsistent with that of plaintiff.

*First Investors Corp. v. Rayner*, 738 So.2d 228, 234-35 (Miss. 1999) (quoting *Thomas*, 246 Miss. at 20-21, 149 So.2d at 23 (1963) (internal citations omitted). Thus, there is a conversion only when there is an "intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Rayner*, 738 So.2d at 234. While intent is necessary, it need not be the intent to be a wrongdoer. *Id.*

¶15. In *Courtney I*, this Court held that the Bank holds no proper security interest in the Super E backhoe. The record indicates that the Bank collected this piece of equipment and held it in a manner adverse to Courtney's rights. Thus, we find that the Bank converted the Super E backhoe.

6

¶16. The record reveals that Courtney paid off the concrete truck before the Bank repossessed it. In fact, the Bank released the lien on that piece of equipment and gave Courtney the title. Therefore, we find that the Bank did not have a valid security interest in the concrete truck at the time of the repossession and the Bank, therefore, converted that piece of property.

¶17. Moreover, the record indicates that Courtney owned a set of chains and binder. The Bank never had a security interest in those items but nevertheless collected them. We hold that the Bank converted the chains and binder.

¶18. The transit and the water system repair clamps, do not appear in Courtney's amended counterclaim. However, the counterclaim does state that Courtney had personal property contained in the equipment listed. The record establishes that the Bank never had a security interest in these chattels but nevertheless collected these items.

¶19. Finally, Courtney owned a "Ditch Witch," and the Bank had a security interest in that piece of equipment. At the time the Bank repossessed the Ditch Witch, there were two implements attached to it, a backhoe and a trencher. Citing **PACCAR Fin. Corp. v. Howard**, 615 So.2d 583, 590 (Miss. 1993), the Bank argues that it obtained a security interest in these two implements because they were attached to the Ditch Witch, a piece of secured collateral.

¶20. At the time of this trial, the Mississippi Uniform Commercial Code provided that "a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." Miss. Code Ann. § 75-9-201 (repealed by Laws 2001, Ch. 495). The security agreement that covered the Ditch Witch defined the term "property" as "all property as that **is now or later becomes attached to**, a part of, or results from the described property." (emphasis added). We

7

find that the security agreement covered the Ditch Witch implements and the Bank, therefore, had a valid security interest in those items.

¶21.    We find that Courtney was entitled to damages resulting from the Bank's conversion of the Super E backhoe, chains and binder, concrete truck, transit, and water system repair clamps.

### III.    Compensatory Damages.

¶22.    We have held that a party may testify as to the value of his or her own property. *Regency Nissan, Inc. v. Jenkins*, 678 So. 2d 95, 101 (Miss. 1996). "We have not indicated whether this estimate of value must be rationally based. Nor have we required any predicate other than that of ownership." *Id.* However, the Mississippi Rules of Evidence now prohibit layperson testimony on matters within the scope of Rule 702. These matters are those in which the witness testifies based on "scientific, technical, or other specialized knowledge." This prohibition was not in effect at the time the instant case was tried.

¶23.    The testimony and documentary evidence in this case establish that Courtney clearly owned seven pieces of the property at issue here. As discussed above, the Bank converted five of those pieces of equipment. At trial, Courtney testified that those five items have a value of $45,040. Pursuant to established jurisprudence at the time of this trial, we find that it was appropriate for Courtney to testify regarding the value of this equipment.

¶24.    In a conversion action, the measure of damages is the value of the property at the time and place of the conversion. *West v. Combs*, 642 So.2d 917, 921 (Miss. 1994). Moreover, this Court has stated that damages resulting from a conversion that "are not ordinary, usual, or commonly to be expected, are recoverable" so long as the parties in question have those effects in contemplation at the time of the wrong as the probable result. *Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So.2d 187, 191-92 (Miss.

8

2000). These unusual consequences may not, however, be uncertain, unnatural, remote as to cause, nor speculative and conjectural in effect. *Id.* at 191. In general, lost profits may be recovered in a conversion action "where the loss is a proximate result of the defendant's act, and where the loss can be shown **with reasonable certainty**." *Id.* at 192 (emphasis added). In addition, we have held that damages beyond the property's fair market value are recoverable even if the conversion occurs in good faith. *Id.* at 191.

¶25.    At trial, Courtney's attorney asked him what the rental value on the equipment would have been during the time he did not have the equipment. He testified that over nine years, "[y]ou are looking at probably $800,000 considering what it would rent and what the equipment would have made back then." This is the only evidence regarding Courtney's lost profits. In fact, the trial court noted,

> I want the record to clearly reflect the only evidence that was put on by the Plaintiff about that was a figure of $800,000 as what he places as a rental value or whatever on this. And I find as a matter of finding that there was no credible evidence that would meet any type of standard under law as to substantiate the loss of use of those items.

¶26.    We find that Courtney's statement regarding the "rental value" of his equipment is insufficient to support a finding of lost profits in this case. Under our case law, lost profits are allowable in a conversion action, but only if those damages can be shown with reasonable certainty. Moreover, those damages may not be unnatural, remote as to cause, nor speculative and conjectural in effect. We hold that Courtney's evidence of lost profits fails to meet these standards.

¶27.    As the Bank correctly notes, where mental distress damages are alleged in connection with intentional tortious conduct, "the standard is whether the defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." *Morrison v. Means*, 680 So.2d 803, 805 (Miss. 1996) (quoting *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So.2d 648, 659 (Miss.

9

1995)). Where the tort complained of is "one of ordinary garden variety negligence, the plaintiffs...have to prove some sort of injury, whether it be physical or mental. If the conduct was not malicious, intentional or outrageous, there must be some sort of demonstrative harm." *Ill. Cent. R.R. v. Hawkins*, 830 So.2d 1162, 1174 (Miss. 2002) (quoting *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch., Inc.*, 759 So.2d 1203, 1211 (Miss. 2000)).

¶28.    The only evidence concerning Courtney's alleged emotional distress damages consists of Courtney's own testimony about stomach problems he purportedly developed as a result of losing his equipment and business. We find that this evidence is insufficient to support a finding that the Bank's behavior was malicious, intentional, willful, wanton, grossly careless, indifferent or reckless. Nor did this testimony prove any type of demonstrable harm. Therefore, Courtney's evidence of mental anguish is insufficient as a matter of law under either standard.

¶29.    Pursuant to Miss. Code Ann. § 11-1-55 (Rev. 2002), this Court is empowered to affirm judgments for money damages on the condition of remittitur. In order to do so, we must find that damages awarded "are excessive for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence." If the remittitur is not accepted, then we may direct a new trial on the issue of damages only. *Id*. Where a remittitur is accepted and the other party files an appeal, the accepting party may cross-appeal the trial court's action regarding the remittitur. *Id*.

¶30.    We review the denial of a remittitur for abuse of discretion. *Entergy Miss., Inc. v. Bolden*, 854 So.2d 1051, 1058 (Miss. 2003). There are no standards governing when a remittitur is proper; thus, we proceed on a case-by-case basis in determining whether a particular jury award is excessive. *Id.* We will not interfere with a jury's award of damages unless the size of the award, in comparison with the actual

10

amount of damage, shocks the conscience of the Court. *Id.* If there is insufficient proof to support the award of damages, a remittitur is appropriate. *Id.* It is elementary that the plaintiff has the burden of proving her damages by a preponderance of the evidence. *Id.*

¶31. As demonstrated above, the compensatory damage award was against the overwhelming weight of credible evidence. According to Courtney's own testimony, the property that he actually owned only had a value of $45,040. The meager evidence Courtney offered on the issue of lost profits fails to meet this Court's standards. Likewise, he offered only conclusory statements regarding mental distress damages, and we find that his assertions on this point fail to satisfy this Court's standards. As such, we hold that the size of the compensatory damages award, in relation to the actual amount of damage, "shocks the conscience" of this Court, and the trial court abused its discretion in refusing to grant a remittitur on compensatory damages. That award should be remitted to $45,040.

### III.     Punitive damages and J.N.O.V.

¶32. "Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed with caution and within narrow limits." *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So.2d 620, 622 (Miss. 1988). The Legislature has determined that punitive damages are allowable under certain circumstances only, namely:

> (1) In any action in which punitive damages are sought:
>
>> (a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

* * *

11

> (d) The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount.

Miss. Code Ann. § 11-1-65 (Rev. 2002). Trial judges have the "authority to initially determine whether the particular facts of a case merit the submission of the issue of punitive damages to the jury." **Alpha Gulf Coast, Inc. v. Jackson**, 801 So.2d 709, 733 (Miss. 2001).

¶33. At trial, Courtney testified that one of the Bank's employees intended to put him out of business. Courtney contacted Wayne Davis at the Bank to inform him that the consolidated note had been altered. Courtney then stated that Davis's "exact words was to me 'I got [it] on my note. I am going to get it. I'm going to put you out of business. You didn't help me when I needed it, and I ain't doing it in return.'" According to Courtney, Davis told him he "could carry it to court, but [he] would never live long enough to get a dime." Davis specifically denied Courtney's allegations, stating "[w]e have no knowledge of that. We did our sincere effort [to] work with Mr. Courtney." Davis stated that he did not have any kind of ill will against Courtney. Courtney did not provide any corroborating testimony regarding Davis's alleged statements. Interestingly, the trial judge concluded that

> [t]here was one little item of evidence about one of the officers...making a statement to the defendant that he was going to put him out of business. But other than that, there is really not a lot of evidence of any wrong or morally reprehensible motivation on the part of the bank in this matter.

In addition, the trial judge stated that the Bank's conduct in this case "was not that reprehensible."

¶34. We find that there is insufficient evidence in this case to support a jury charge on the issue of punitive damages. The only evidence that remotely approaches one of the statutory requirements is Davis's alleged out-of-court statement regarding his intention to put Courtney out of business. We find that this self-serving hearsay statement is in no way clear and convincing evidence of actual malice, gross negligence,

12

or the commission of actual fraud. Accordingly, we find that the trial court erred when it denied the Bank's motion for j.n.o.v. on the issue of punitive damages. Pursuant to the controlling standard of review, we reverse and render that verdict.

### IV. The Bank's remaining assignments of error and Courtney's cross-appeal.

¶35. We have carefully reviewed the Bank's remaining assignments of error and find that they are without merit. In light of our findings, supra, Courtney's contentions on cross-appeal are moot and will not be discussed.

## CONCLUSION

¶36. For the foregoing reasons, we affirm as to liability but remit the compensatory damages awarded in the judgment below from $306,196.88 to $45,040 and affirm the judgment as remitted to $45,040 provided this remitted judgment is accepted by Archie Wayne Courtney within ten (10) days of the final judgment of this Court. Otherwise, the judgment is vacated, a new trial confined to the issue of compensatory damages is granted, and the case is remanded for such. Should Courtney accept the remittitur, the principal sum of $45,040 will be payable together with interest at the legal rate from the date of the original judgment in the trial court. We reverse and render the punitive damages award.

¶37. **AFFIRMED AS TO LIABILITY; JUDGMENT REMITTED FROM $306,196.88 TO $45,040, AND AFFIRMED AS REMITTED, CONDITIONED ON ACCEPTANCE BY ARCHIE WAYNE COURTNEY WITHIN 10 DAYS OF THE FINAL JUDGMENT OF THIS COURT. OTHERWISE, THE JUDGMENT IS VACATED, AND THE CASE IS REMANDED FOR A NEW TRIAL AS TO COMPENSATORY DAMAGES ONLY. REVERSED AND RENDERED AS TO PUNITIVE DAMAGES.**

**WALLER AND COBB, P.JJ., AND CARLSON, J., CONCUR. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. DIAZ, DICKINSON AND RANDOLPH, JJ., NOT PARTICIPATING.**

13

**EASLEY, JUSTICE, DISSENTING:**

¶38. I respectfully dissent from the majority's remitting the compensatory damages from $306,196.88 to $45,040 and reversing and rendering the award of $1.5 million in punitive damages.

## I. Conversion and JNOV

¶39. The majority holds that Courtney owned the concrete truck, the ditcher, the backhoe, the chains with binders, the transit and water system repair clamps. I agree. However, the majority also find that the bank did not convert all the equipment, such as the Mack truck and the fastback trailer. I disagree.

¶40. Courtney stated that he jointly held the SuperE backhoe with his father; Courtney owned the two sets of chains and binders, the ditcher, auto cement mixer, backhoe attached to the trencher, the transit, and the water system repair clamps; and Courtney's father owned the Mack truck and fastback trailer. As for the Super E backhoe, Courtney appears to claim that his father assisted in paying for the Super E backhoe and that his father therefore acquired an interest in it. When asked who was the owner by the defense in its case in chief Courtney stated "Well, my myself and my daddy. I've already stated in [the] previous thing, daddy come part owner of the thing when he paid that tractor off after I made that big note payment."

¶41. All the equipment, except the Super E backhoe, was on Courtney's property at the time the bank picked up the items. The Super E backhoe was picked up at a later time from a work site location. Courtney used the equipment in his business. Therefore, Courtney had the equipment in his possession and control until such time as the bank picked it up from the home and site location.

¶42. It is true that the trial judge refused to allow Courtney to amend his complaint to include his father in the action. However, the trial judge allowed the issue of ownership to go to the jury. The jury heard all the evidence and testimony concerning the ownership of the equipment and rendered a verdict. Further,

14

the bank did not ask for special interrogatories so there is not way of knowing how the jury assigned the damage award for the conversion of the property nor even if each piece of property was assigned a damage amount. Therefore, I conclude that the evidence established that the bank converted all of the nine pieces of equipment, including the Super E backhoe, from Courtney who had possession and control over the property until the bank picked it up from his property and work site.

## II. Conversion and security interests

¶43. I respectfully disagree with the majority's holding that the bank had a security interest in the backhoe and ditcher.

¶44. The Bank allegedly had security interests in four pieces of equipment: (1) Super E backhoe; (2) auto cement mixer; (3 and 4) ditch witch and trencher (a.k.a. backhoe). The majority holds that the bank converted the Super E backhoe and the concrete truck. I agree. In addition, the majority holds that even though there was no security interest, the bank converted the chains and binder. I agree. The majority also holds that even though there was no security interest, the bank collected the transit and water system repair clamps. I agree and would add that the bank converted these items in addition to the Mack truck and fastback trailer.

¶45. As for the backhoe and trencher, the majority holds that the bank had a security interest in these items as attachments to a Ditch Witch. The bank argues that there was no dispute as to the bank's security interest in a ditch witch. However, there is a question as to whether a ditcher and backhoe were attachments to a ditch witch and therefore a part of the ditch witch. A bank representative, Stroud, testified that the equipment could be added or taken off the ditch witch. The Bank cites to *PACCAR Fin. Corp. v. Howard*, 615 So.2d 583, 590 (Miss. 1993), for the premise that tires that were placed on some secured collateral were considered to be fixtures. However, a ditcher and backhoe are removable and the

15

ditch witch operation does not rely upon these items. Therefore, I disagree with the majority's holding on these pieces of equipment.

### III. Compensatory Damages

¶46.    I respectfully dissent from the majority's holding to remit the compensatory damages from $306,196.88 to $45,040.

¶47.    The Bank contends that there was insufficient evidence concerning the value of the equipment, the lost profits and the mental or emotional anguish. First and foremost there was a general verdict in this case. The bank did not request special interrogatory answers with a break down of the damages from the jury. Also, effective May 29, 2003, M.R.E. 701 concerning the opinion testimony by a lay witness was amended and restricted. Previously, M.R.E. 701 read as follows:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.

Now there is the added prohibition that the testimony is "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Since the matter was filed and tried well before the effective date of May 29, 2003, the current restriction on lay witness testimony was not relevant for the case sub judice. Furthermore, the Bank offered no person that was qualified as an "expert" of its own to refute Courtney's testimony. In addition, the Bank did not object to Courtney's testimony concerning valuation or loss profits throughout the trial.

¶48.    Courtney testified on cross-examination that he had rented the dump truck for $800 a week, the Super E backhoe for $250 a week and that rental of equipment was part of his business. He also stated the cost of the unreturned transit would be $600 and to replace the transit it would cost $3,500. When the

16

Bank asked Courtney what lost profits could he contribute to the bank, he stated that he was put out of business. Courtney stated that Super E backhoe was worth $25,000 basing the value on published trading magazines and attending many auctions. Courtney valued the Mack truck at $10,000 based upon an offer for the truck the same day it was picked up by the Bank. He also stated on cross that he takes some medication to stop eating. When asked about the concrete truck by his own counsel, Courtney stated that he paid $7,500 for it and got an engine for $2,000.

¶49.     The Bank cites to a number of cases for authority. In *Pride Oil Co. v. Tommy Brooks Oil Co.*, 761 So.2d 187, 191-92 (Miss. 2000), this Court held:

> [E]ven if conversion occurs in good faith, the complaining party may nonetheless recover damages beyond the fair market value of the converted property.
>
> The Court's holding in *Walker* appears to be in line with the majority viewpoint. Generally, "[d]amages flowing from a conversion which are not ordinary, usual, or commonly to be expected, are recoverable if, under the circumstances, it can be fairly said that both parties have these consequences in contemplation at the time of the wrong complained of, as the probable result thereof, and if these unusual consequences are neither uncertain, unnatural, nor remote as to cause, nor speculative and conjectural in effect." 18 Am.Jur.2d Conversion § 117, at 231 (1985) (citing *Colorado Kenworth Corp. v. Whitworth*, 144 Colo. 541, 357 P.2d 626 (1960)). Also, "the general rule is that compensation for lost profits may be recovered in an action for conversion, where the loss is a proximate result of the defendant's act, and where the loss can be shown with reasonable certainty." 18 Am.Jur.2d Conversion § 119, at 232 (1985) (citing *Colorado Kenworth Corp. v. Whitworth*, 144 Colo. 541, 357 P.2d 626 (1960)).

In *General Motors Acceptance Corp. v. Baymon*, 732 So.2d 262, 272 (Miss. 1999), this Court held:

> A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify and offer opinions if his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." M.R.E. 702. However, this Court will limit an expert's testimony to matters within his demonstrated area of expertise. *Seal v. Miller*, 605 So.2d 240, 247 (Miss. 1992).

17

¶50.    Courtney cites to *Regency Nissan, Inc. v. Jenkins*, 678 So.2d 95, 101 (Miss. 1996), where this Court held:

> Individuals may testify as to the value of their own property. *Thomas v. Global Boat Builders & Repairmen, Inc.*, 482 So.2d 1112, 1116 (Miss.1986); *Whitfield v. Whitfield*, 40 Miss. 352, 356 (1866). We have not indicated whether this estimate of value must be rationally based. Nor have we required any predicate other than that of ownership. Curiously, in *Thomas*, we have indicated that an owner is somehow not qualified to express an opinion as to the value of property after it has been damaged, without further qualification. *Id*.

In addition, Courtney argues that he was in the plumbing business most of his life and has purchased and financed numerous pieces of equipment. He therefore contends that he is qualified to give reasonable and accurate estimates of the value of property.

¶51.    The Bank argues that certain items (the Mack truck, trailer, and the chain) were only temporarily converted and that the evidence of the other items (580 Super E backhoe, the ditcher, the backhoe, the auto cement mixer truck, the surveyor's transit, and the water system repair clamps) were insufficient to support a damage award. Courtney claims that the items were not temporarily converted because the bank had some items for two years before returning them. Again, since the Bank did not object to the Courtney's testimony concerning valuation, its complaint is therefore waived.

¶52.    In addition, the jury was instructed in D-2 in part as follows:

> The Court instructs the Jury that the measure of damages for conversion is the fair market value of the converted property at the time of the conversion.

Jury Instruction D-3 stated:

> The Court instructs the Jury that the general rule is that compensation for lost profits or other compensatory damages may be recovered in an action for conversion, where the loss is a proximate result of the Defendants, Community Bank's act, and where the loss can be shown with reasonable certainty and is neither uncertain, unnatural, nor remote as to cause, nor speculative and conjectural in effect.

18

Based on the testimony and instructions the jury determined a damage amount resulting from the Bank's actions. There is nothing to indicate that the jury did not follow the jury instructions given to them. The Bank also argues that the testimony about the items sold at the auction was insufficient. Courtney testified that the backhoe was worth $25,000; the two chain binders "would bring" a minimum of $40; the Mack truck $10,000; the trencher (backhoe) $2,500; the auto cement concrete truck $15,000; the backhoe attachment $3,500; the fastback trailer $2,500; the transit $3,500 and the water system pump $1,500. Courtney offered a list of the equipment with values on it to which the Bank made no objection. Courtney also stated that if he had had the items then he would have been able to continue with his business. Courtney clearly gave the value for the equipment as he knew them to be based upon his work in the plumbing industry, attending auctions for equipment, and based upon previous rental of equipment.

¶53. The Bank also complains that there was insufficient evidence as to the lost profits. Courtney testified as to the rental price of the backhoe and dump truck. He also stated that over a nine or ten-year period he more than likely lost $800,000.

¶54. The Bank also argues that Courtney did not provide sufficient proof of mental and emotional distress. Courtney requested no instruction to that effect nor did the bank request the prohibition of mental or emotional distress. There was testimony that Courtney had stomach problems and wanted to eat all the time. He stated that he visited the doctor and took some medication for the problems. Again, the jury returned a general verdict and there were no special interrogatories to determine how the jury arrived at the $345,000 damage amount. It cannot be said that the jury did not properly follow the instructions, and the Bank did not have an expert nor did the Bank object to testimony concerning valuation and lost profits. I therefore disagree with the remittitur.

### IV. Punitive Damages

19

¶55. I disagree with the majority holding to reverse and render the punitive damages award.

### A.  Submission of the punitive damages issue to the jury

¶56. The trial judge determined that there was an issue for the jury to determine punitive damages in this case. The applicable Mississippi statute concerning punitive damages is Miss. Code Ann. § 11-1-65, which states in part:

> (1)  In any action in which punitive damages are sought:
>
>> (a)  Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.
>>
>> (b)  In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.
>>
>> (c)  If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing before the same trier of fact to determine whether punitive damages may be considered.
>>
>> (d)  **The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount...**

Miss. Code Ann. § 11-1-65 (Supp. 2001) (emphasis added). The statute and case law specifically give the trial court the authority to initially determine whether the particular facts of a case merit the submission of the issue of punitive damages to the jury. *Id*. Miss Code Ann. § 11-1-65 (1)(d) (Supp. 2000). This Court has held:

> In determining the propriety of submitting the issue of punitive damages to the jury, the trial court decides whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard.

***Ross-King-Walker, Inc. v. Henson***, 672 So.2d 1188, 1191 (Miss. 1996). *See also **Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc.,*** 759 So.2d 1203, 1215 (Miss. 2000); ***Wallace v. Thornton***, 672 So.2d 724, 728 (Miss. 1996); ***Thomas v. Harrah's Vicksburg Corp.***, 734 So.2d 312, 322 (Miss. Ct. App. 1999). The trial court has the discretion to determine if the issue of punitive damages are to be submitted to the jury in cases involving both intentional and non-intentional torts.

¶57.　This Court has held that punitive damages are assessed in extreme cases and are intended to be an example and warning to others. ***Wallace*** 672 So.2d at 728. "However, there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases*.*" ***South Cent. Bell v. Epps***, 509 So.2d 886, 892 (Miss. 1987). This Court held that a plaintiff can recover punitive damages only if there is a demonstrated willful or malicious wrong or if there is gross, reckless disregard for the rights of others. ***Boling v. A-1 Detective & Patrol Serv. Inc.***, 659 So.2d 586, 588 (Miss. 1995). In ***Colonial Mortgage Co. v. Lee***, 525 So.2d 804, 807-08 (Miss. 1988), this Court held that when a trial court is faced with the decision whether to grant a punitive damages instruction "[t]he question is whether there is a sufficient evidentiary basis to warrant the instruction, i.e., is the evidence sufficiently disputed that a jury issue has been made?" The test to determine this is as follows:

> The test is the same when the propriety of the instruction is tested via post- trial motions for judgment notwithstanding the verdict. The trial court--and this Court on appeal--must look at the elements of the punitive damages claim enumerated above and decide whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could have found either malice or gross neglect/reckless disregard.

*Id*. In determining whether the issue of punitive damages should be submitted to the jury, the trial court must decide " 'whether under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could have found either malice or gross negligence or

21

reckless disregard.'" *Wallace*, 672 So.2d 728. (quoting *Peoples Bank & Trust Co. v. Cermack*, 658 So.2d 1352, 1361 (Miss.1995).

¶58. Conversion is an intentional tort. The trial court ruled that there was an issue of punitive damages to be submitted to the jury. The trial court determined that there was sufficient evidence for the issue of punitive damages to be submitted to the jury. In making his decision to submit the issue of punitive damages to the jury, the trial court referenced the testimony from a bank officer who stated that he was going to put Courtney out of business. Indeed, Courtney testified that when realized that the consolidated note had been altered, he called Wayne Davis at the Bank. Courtney then stated that "[a]nd his exact words was to me 'I got [it] on my note. I am going to get it. I'm going to put you out of business. You didn't help me when I needed it, and I ain't doing it in return.'" When Courtney told Davis about filing a law suit, Courtney stated "[a]nd he told me that I could carry it to court, but I would never live long enough to get a dime."

¶59. In addition, the record shows that Courtney disputed the Bank's claim on the equipment from the very beginning. As soon as he received notice, Courtney appeared numerous times in court and even filed an appeal to this Court prior to the auction. The Bank knew of the appeal and yet continued to proceed with the auction. In addition, the Bank clearly had possession of some equipment that was not even listed on the order of possession and did not return the equipment in a prompt manner. I conclude that under the totality of the circumstances and viewing the Bank's conduct in the aggregate, a reasonable, hypothetical trier of fact could have found either malice or gross negligence or reckless disregard. Thus, the trial court did not err in submitting the jury instructions for punitive damages to the jury.

B. **Excessive damages**

22

¶60.    The Bank argues that its actions were a mistake and the award was constitutionally excessive citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575-86, 116 S.Ct. 1589, 1598-99, 134 L.Ed.2d 809 (1996).  In determining whether a punitive damage award is grossly excessive the United States Supreme Court reviewed three criteria in *BMW.*  More recently, in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L. Ed. 2d 585 (2003), the United States Supreme Court applied the three criteria set out in *BMW,* which will be discussed in detail below.   In general the Court in *Campbell*,  held that compensatory damages are meant to "redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Campbell*, 123 S.Ct. at 1519.  Punitive damages on the other hand have a "broader function; they are aimed at deterrence and retribution." *Id*. (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)).

¶61.    The *Campbell* Court further stated that a State has discretion in its imposition of punitive damages, however, "there are procedural and substantive constitutional limitations of these awards" and "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." 123 S.Ct. at 1519-20.  The reason for the prohibition concerns "notions of fairness" in our constitutional jurisprudence which "dictate that a person receives fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."' *Id*. at 1520.  If the punitive damage award is grossly excessive, then it does not further any legitimate purpose and is an arbitrary derivation of property. *Id*.

¶62.    When examining the three criteria set out in *BMW*, the United States Supreme Court  previously mandated that an appellate court must "conduct a de novo review of a trial court's application of them to

23

the jury's award." *Campbell*, 123 S.Ct. at 1520. In *American Income Life Ins. Co., v. Hollins*, 830 So.2d 1230, 1242 (Miss. 2002), this Court held:

> We also recognize that the U.S. Supreme Court has held that where a federal constitutional challenge is made to a punitive damages award on the basis of excessiveness, then and only then, are we required to conduct a de novo review of the award. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc*., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). *See also* **Todd v. Roadway Exp., Inc.**, 178 F.Supp.2d 1244, 1245-46 (M.D.Ala.2001); *Time Warner Entertainment Co. v. Six Flags Over Georgia*, LLC, 254 Ga.App. 598, 563 S.E.2d 178 (2002). Essentially, *Cooper* gives a defendant another bite at the appellate apple if it clearly alleges a federal constitutional violation.

The three criteria set-out in *BMW* and also more recently applied in *Campbell* and *Cooper Industries*, are "the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered [a plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of North America, Inc. v. Gore*, 517 U.S. at 575-86, 116 S.Ct. at 1598-99.

¶63.    Again, the Bank claims that its conduct was no more than a mistake.  In addition, the Bank cites to the trial court's statement that other than a bank officer's statement to Courtney that he was going to put him out of business there was not a lot of evidence of wrongdoing by the bank.  The Bank further claims that it picked up the equipment pursuant to the order of possession and acted in good faith under the terms of the consolidated note and security agreement, the Uniform Commercial Code (UCC) and the court order.

¶64.    Applying a de novo standard of review, I examine the three criteria pursuant to *BMW* and the more recent case of *Campbell*.

### 1.      Degree of reprehensibility

¶65.	Under the **BMW** criteria the Bank claims that its actions were not reprehensible. Again, at best the Bank claims that it may have made some mistakes but nothing more. The Bank notes that it had an order of possession and merely picked up the items and sold some of them, returning items that Courtney requested from the Bank.

¶66.	In **Campbell**, the United States Supreme Court held:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident

123 S.Ct. at 1521. The **Campbell** Court further held that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award" but that the absence of them would make an award suspect. **Id**.

¶67.	I conclude that the Bank's conduct here was sufficiently reprehensible to permit an award of punitive damages. This Court previously found in **Courtney I** that the Bank had no security interest in the Super E backhoe, in addition the Bank released the lien on the cement mixer and clearly took possession of various pieces of equipment that either were not listed on the order of possession or in which there was no security interest. Further, testimony by Bank representatives indicated that at the time of collecting the equipment there was not a thorough check that the equipment picked up was the actual equipment listed on the order of possession. While contested, there was also the issue of whether a Bank representative in effect refused to assist and threatened to put Courtney out of business. Also, there was the issue of the return of equipment that the Bank erroneously collected and the Bank's actions and time frame in correcting the error. While the Bank sought an order of possession in this matter, it was aware of Courtney's lawsuit

and appeal to this Court. At the very least, Courtney appealed the decision of the trial court concerning the backhoe and other items allegedly erroneously possessed by the Bank in July 1992. To the extent that the Bank knew of the lawsuit and appeal and yet sold some equipment at auction in dispute in September 1992, the Bank went forward with the sale and assumed the risk that it might not prevail on appeal. The reprehensibility of the Bank's actions clearly falls within the parameters set forth in *Campbell*. At the very least, the damage involved in this case was economic; Courtney was the target of the Bank's actions and was financially vulnerable, this was evidenced in part by Courtney losing his business, income and livelihood when the Bank possessed his equipment. The Bank was either indifferent or reckless by taking possession of numerous items that either were not listed on the order of possession or which it had no right to possess. The Bank repeatedly did not check the order of possession against the actual items taken from Courtney and Courtney notified the Bank that it had erroneously taken equipment yet the Bank either sold items at auction knowing that an appeal was pending with this Court or were slow to return items to him indicating at least intentional malice but certainly not doing these actions by any accident.

### 2. Ratio between the penalty to the actual harm to Courtney

¶68. As for the ratio between the penalty to the actual harm to Courtney, there is a 14.5 to 1 ratio. However, the Bank claims that Courtney was not harmed because the proceeds of the auction were applied to the debt. Further, the Bank appears to claim that even applying the proceeds to the debt owed by Courtney, there is still a $17,000 deficiency. Therefore, the debt owed was simply reduced by the Bank's actions and Courtney was not harmed by these actions.

¶69. In *Campbell*, the Court declined to impose a bright line ratio which a punitive damage award may not exceed. *Campbell*, 538 U.S. at 1524, 123 S.Ct. at 1513. However, the Court held further that "[s]ingle-digit multiplier are more likely to comport with due process" and still maintain a State's objective

26

of deterrence and retribution rather than awards with much higher ratios such as 500 to 1. ***Id.*** The original punitive damages awarded by the jury had a ratio of 14.5 to 1, that being, $5,000,000 in punitive damages to $345,000 in compensatory damages. This ratio was reduced by the trial court remittitur of the punitive damages award to $1,500,000, thus reducing the ratio to 4.3 to 1. The Bank notes that Courtney was not harmed by applying the proceeds of the auction to his debt, forgetting that in the process of possessing, selling, returning equipment at a later date and not returning some equipment at all, that he went out of business. The ratio in the case sub judice after remittitur is a single digit multiplier and is not inconsistent with the ***Campbell*** decision on this point.

### 3. Sanctions imposed in similar cases

¶70. Insofar as sanctions imposed in other similar cases, the Bank cites to a number of cases including ***Ivy v. General Motors Acceptance Corp.***, 612 So.2d 1108 (Miss. 1992) (punitive damages of $100,000 not upheld on appeal); ***Smith v. Orman***, 822 So.2d 975(Miss. Ct. App. 2002) (punitive damages for conversion in the amount of $20,000). The Bank also cites to Miss. Code Ann. §§ 97-23-19 & 97-23-25 in which it claims the maximum fine is $1,000. Upon viewing § 97-23-19 an embezzlement statute, the statute provides that an agent, bailee or other persons may be fined not more than $10,000 and imprisoned not more than 10 years if the value of the property is $500 or more, and may be fined not more than $1,000 and imprisoned not more than (6) six months if the property is less than $500. The other statute, § 97-23-25 concerns embezzlement carries a penalty of "imprisonment in the penitentiary not more than ten years, or be fined not more than one thousand dollars and imprisoned in the county jail not more than one year, or either." It is curious that the bank failed to include the higher fines and possible imprisonment in its argument. Based on these cases, the Bank asserts that the punitive damage award is excessive.

¶71. Courtney cites to *Hudson v. Cook*, 105 S.W.3d 821 (Ark. Ct. App. 2003) where a punitive damage award with a 7 to 1 ratio was upheld for a conversion case. Clearly, the reduced punitive damage award by the trial court here, being slightly more than a 4 to 1 ratio, is not excessive. The evidence showed that the Bank possessed some equipment that it had no right to take, possessed equipment that was not even on the order of possession, failed to check that the equipment taken matched the order, kept some of the equipment for a period of time before returning it, sold some equipment at auction knowing that Courtney was in the process of appealing the matter to this Court, and a Bank employee allegedly stated that he would not assist Courtney and put him out of business. As for the comparison of possible criminal statutes and the corresponding fines and penalties, Courtney asserts that the Bank did not take into account that these penalties also impose imprisonment, both statutes having a maximum of up to 10 years. Indeed, imprisonment is a loss of freedom and arguably by most standards more valuable than punitive damage awards. Accordingly, I believe that the punitive damage award was appropriate in the case sub judice.

¶72. For the foregoing reasons, I disagree with the majority's holding of remitting the actual damages to $45,040 and reversing and rendering as to the punitive damages. However, I would affirm the rulings of the Jones County Circuit Court as to all direct appeal issues briefed by Community Bank. I conclude that the Jones County Circuit Court did not err in remitting Courtney's actual damages in the amount of $345,000 to $306,196.18 and remitting the punitive damages in the amount of $5,000,000 to $1,500,000 and would affirm the trial court rulings concerning Courtney's cross-appeal on the issue of the remittitur of the actual and punitive damages.

**GRAVES, J., JOINS THIS OPINION.**